# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

MARCIE JEANETTE PENNINGTON, )
)
         **Plaintiff,** )
)
v. )   Case No. CIV-22-CV-368-SPS
)
MARTIN O'MALLEY,[1] )
**Commissioner of the Social** )
**Security Administration,** )
)
         **Defendant.** )

## OPINION AND ORDER

The claimant Marcie Jeanette Pennington requests judicial review pursuant to 42 U.S.C. § 405(g) of the denial of benefits by the Commissioner of the Social Security Administration. She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*.

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kiakazi as the Defendant in this action.

§ 423 (d)(2)(A).  Social security regulations implement a five-step sequential process to evaluate a disability claim.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  The Court may not reweigh the evidence or substitute its discretion for the Commissioner's.  *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991).  But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  *See also Casias*, 933 F.2d at 800-01.

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity.  Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities.  If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied.  If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1.  If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry.  Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work.  At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC.  Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work.  *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

### Claimant's Background

Claimant was born on December 18, 1984, and was 36 years old on the alleged disability onset date. (Tr. 30). She was 38 years old at the time of the most recent administrative hearing. (Tr. 189). Claimant has completed her GED and has no past relevant work experience. (Tr. 30). Claimant alleges she has been unable to work since March 8, 2021, initially alleging disability due to issues with obesity, major depressive disorder ("*MDD*") with psychotic features, panic disorder with agoraphobia, post-traumatic stress disorder ("*PTSD*") (chronic), dysthymia (early onset), dependent personality traits, asthma, back spasms, a torn ligament of the right knee, and gastroesophageal reflux disease ("*GERD*"). (T 617, 710, 713, 715, 729, 737, 757).

### Procedural History

On March 8, 2021, Claimant filed an application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. (Tr. 16, 242, 268, 381). Her application was denied. ALJ Edward M. Starr held an administrative hearing and determined that Claimant was not disabled in a written decision dated June 22, 2022. (Tr. 16-32). The Appeals Council denied review, so the ALJ's written opinion became the final decision of the Commissioner for purposes of appeal.

### Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. At step two, the ALJ found that Claimant had several severe physical and mental impairments, including major joint dysfunction, disease of the esophagus, obesity, depression, anxiety, trauma-related disorder, and personality disorder. (Tr. 19).

Next, he found that Claimant's impairments did not meet a listing. (Tr. 19). At step four, he found that Claimant retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) with the following qualifications:

> (T)he claimant can except she can frequently finger and handle bilaterally; and can occasionally climb, crawl, kneel, stoop, and crouch. In addition, she is limited to simple and routine tasks; can respond to supervision that is simple, direct, and concrete; can relate to co-workers and supervisors on a superficial basis; and cannot relate to the general public.

(Tr. 22). The ALJ found that transferability of skills was not an issue because Claimant had no past relevant work, so he proceeded to step five and determined that she was not disabled because there was work that she could perform in the economy, *e.g.*, mail clerk, laundry folder, and office cleaner. (Tr. 30-31).

## Review

The evidence before the ALJ reflects that prior to her protective filing date for the current claim, in February 2018, Claimant attended a consultative examination performed by Dr. Conner Fullenwider. (Tr. 603-612). She reported a history of breathing problems since 2017 that were exacerbated by exertion and allergies; the use of inhalers; and associated symptoms of chest pain, fatigue, weakness, and coughing. In addition, she reported bilateral hand pain since 2018 that was exacerbated by activity; and depression, anxiety, and post-traumatic stress disorder [PTSD] that included symptoms of crying spells, mood swings, lack of motivation, concentration problems, social anxiety, panic attacks, and sleep problems. An exam showed clear lungs, no extremity edema, good eye contact, appropriate mood with clear thought processes, normal memory and good concentration, full orientation, a symmetric and steady gait, good hand-eye coordination, no use of an assistive device, no palpable muscle spasms, normal muscle bulk and tone, full muscle

strength in all major muscle groups, full hand grip in both hands, normal sensation, normal-appearing hands and fingers, the ability to use buttons and write, the ability to lift and carry personal belongings, the ability to rise from a sitting position, no difficulty getting up and down from the exam table, the ability to walk on heels and toes with ease, normal tandem walking, the ability to stand but no hop on either foot bilaterally, the ability to dress and undress, and cooperative behavior with good effort. She also had normal range of motion. Overall, Dr. Fullenwider noted a positive bilateral Tinel's sign and that her physical exam was within normal limits. *Id.*

The following year, in February 2019, Claimant attended a consultative diagnostic interview and mental status examination performed by Teresa Horton, Ph.D. (Tr. 613-619). It was noted that her roommate's/friend's father drove her, and that she did not have a driver's license (but that she previously had one). Claimant reported nightmares since childhood, tearfulness, becoming easily overwhelmed, panic attacks (with chest pain and breathing problems), avoidant behavior, and depression. She had attended counseling, had no history of inpatient treatment, and was currently prescribed medications (Celexa and Abilify) that were helpful. The mental status exam showed appropriate grooming, appropriate eye contact, normal speech, friendly attitude, normal gait, logical and goal-directed thought process, full orientation, no pain behaviors, adequate concentration, adequate fund of information and function within the average range of intelligence, somewhat below-average pace, appropriate judgment, and fair insight. *Id.*

In addition, Dr. Horton noted that Claimant appeared socially awkward and uncomfortable, was genuine and capable of communicating effectively in that setting, appeared anxious although euthymic, and was over-talkative. She provided diagnoses of chronic PTSD, early onset dysthymia, and dependent personality traits. In terms of functional status, Dr. Horton assessed

Claimant as capable of understanding, remembering, and managing most simple and complex instructions and tasks (although she appeared to have poor skills to cope with stressors and became easily overwhelmed); that being easily overwhelmed would interfere with management of tasks as they became increasingly complex; that her pace was somewhat below average and appeared to interfere somewhat with her level of productivity; that her social skills were awkward and might interfere with her level of adjustment; and that she might not do well in areas that were fast-paced and/or densely populated (with the exception of areas where or group with whom she was comfortable by history). *Id.*

In March 2019, Claimant saw her PCP, Deborah Gale, APRN, CNS, for leg muscle cramps and right-sided pain. Her active problems were major depression (recurrent, severe, with psychotic features) and panic disorder with agoraphobia. An exam at that time showed no acute distress, normal breath sounds, no costovertebral angle tenderness in her back, normal orientation, and normal gait and stance. She was assessed with pain in the left elbow and unspecified abdominal pain, and she was prescribed naproxen 500 mg once daily for her elbow. (Tr. 660-666). At a follow-up in April 2019, she was also prescribed loratadine 10 mg for other acute sinusitis. (Tr. 668-672). In December 2019, she returned to her PCP for pain in her middle and lower back for three months after she lifted some boxes. She was prescribed Baclofen 10 mg for muscle spasms, as well as a ProAir HFA inhaler for unspecified chronic bronchitis. (Tr. 673-679).

At a follow-up for her back in January 2020, Claimant reported a recent severe panic attack. She also reported that Baclofen helped her chronic muscle aches in her back and joints. An exam showed no acute distress, nasal discharge, normal breath sounds, no wheezing or rhonchi, normal orientation and normal gait and stance. The Baclofen was refilled for her back (and also to help with headaches). It was noted that Claimant had been using her inhaler more. (Tr. 673-679).

Her assessments were muscle spasms of back, other acute sinusitis, pain in left elbow, and unspecified mood (affective) disorder. She was to be referred to behavioral health. *Id.* As of March 2020, her BMI was recorded as 41.1. *Id.* Through mid-2020, Claimant continued to be prescribed Baclofen 10 mg for back spasms, Loratadine 10 mg for acute sinusitis, naproxen 500 mg for left elbow pain, a ProAir HFA inhaler for unspecified chronic bronchitis, and omeprazole 20 mg for unspecified disease of esophagus (related to off-and-on nausea and heartburn for one month, as of July 2020). (Tr. 631-653).

Claimant attended psychiatric medication management appointments between March and July 2020 for major depression (recurrent, severe, with psychotic features) and panic disorder with agoraphobia. Claimant reported nervousness/anxiety, stress, nightmares, and irritability ("snapping at friends"); and her medications included Abilify 10 mg, Celexa 40 mg, and hydroxyzine HCl 50 mg for these conditions. *Id.*

In November 2020, Claimant complained to her PCP of foot pain up into her right knee. An exam showed no acute distress, normal breath sounds, and palpable grinding in her right knee (with some in her left as well). She was assessed with pain in the right knee. (Tr. 654-743). At a follow-up later in the month, an exam showed no acute distress, normal breath sounds, right knee popping with flexion, normal orientation, and normal gait and stance. She was advised to take naproxen and Tylenol for her knee. A right knee x-ray had been performed, although there is no notation of remarkable findings. (Tr. 654-743).

Claimant returned to her PCP in early March 2021 for chest pain that had started during a visit with her counselor. She reported that she had destressed and gotten over it, but continued to have 3-7/10 pain. She denied shortness of breath although use of her inhaler. A review of systems was negative for dyspnea, no wheezing, and localized joint pain, but positive for anxiety with panic

attacks (accompanied by chest pain at times). Claimant reported increased stress related to a family member, which appeared to be directly associated with Claimant's chest pain. An exam showed BMI of 37.4, no acute distress, normal breath sounds, no wheezing, normal heart rate and rhythm, no edema, normal orientation, and normal gait and stance. Claimant's treatment provider recommended that she see her counselor every week for awhile to address unresolved issues. It was noted that although Claimant had asthma that caused shortness of breath, her chest pain was not pressure-like. An EKG showed sinus rhythm. Her assessments were unspecified chest pain, unspecified disease of esophagus (for which she was prescribed omeprazole), left elbow pain (for which she was prescribed naproxen), and unspecified chronic bronchitis (for which she was prescribed the ProAir inhaler). (Tr. 654-743). At a follow-up in early April for chest pain, Claimant reported that she was doing better now. It was noted that Claimant was discussing her stressor(s) and laughing, and that she was doing better. (Tr. 654-743).

In mid-May 2021, Claimant returned to her PCP for back spasms with pain that radiated into her legs. She reported that she was taking naproxen and loratadine every day. An exam showed no acute distress, normal breath sounds, no costovertebral angle tenderness in her back, normal orientation, and normal gait and stance. Her assessments were low back pain, other acute sinusitis, left elbow pain, and unspecified chronic bronchitis. (Tr. 654-743). In early June, Claimant followed up for lab work and lumbar x-rays results. The lab work was unremarkable with the exception of elevated glucose and cholesterol. No remarkable findings were noted as to the lumbar spine x-rays. Her assessment was muscle spasm of back, and she was continued on Baclofen 10 mg once daily. *Id.*

In mid-July 2021, Claimant returned to her PCP for three weeks of poor sleep and appetite. She cited a particular stressor. An exam showed no acute distress, normal heart rate and rhythm,

no costovertebral angle tenderness in her back, normal orientation, and normal gait and stance. Claimant was offered reassurance, and it was noted that she had an upcoming appointment with her counselor. (Tr. 744-793, Tr. 794-813).

Through the end of 2021, Claimant returned to her PCP for complaints that included right leg pain after she fell off her porch (with bruising upon exam), pain in her chest area when bending or during a panic attack (for which Tylenol helped, but naproxen did not), and anxiety and stress related to a family member. Examinations continued to be consistent with prior exams, and an EKG was normal. (Tr. 744-793). As of early December 2021, she reported that although she still had chest pain, it only occurred when she bent to put pants on. She denied any shortness of breath associated with the chest pain. Her assessments were unspecified chest pain and unspecified chronic bronchitis. (Tr. 783-787).

She returned mid-December and reported ongoing chest pain with particular stress related to the same family member. It was noted that Claimant's psychiatrist did not think a medication change was warranted at that time because he attributed her symptoms to seasonal depression. Claimant's assessments were unspecified chest pain and GERD without esophagitis, and she was referred to a cardiologist to help determine if chest pain was anxiety only. (Tr. 790-793).

Claimant attended a cardiology consultation in March 2022. An exercise treadmill stress test was normal, without evidence of ischemia. An echocardiogram was unremarkable. (Tr. 794-813). The same month, she also saw her psychiatrist and reported that she had not been able to see her counselor recently and that she recently had such a bad panic attack that she fell to her knees in Wal-Mart. Generally, she stated that the last several months had not been good. However, she also said that her medications were good without changes. Her medications were Celexa 40 mg

for agoraphobia with panic disorder, hydroxyzine HCl 50 mg for anxiety disorder, and Latuda 80 mg for major depressive disorder (recurrent, severe, without psychotic features). (Tr. 814-818).

Claimant contends, *inter alia*, that there was an unresolved conflict between the VE's testimony and her RFC, because the mail clerk occupation that the VE identified as a job that a person with her RFC could perform had a General Education Development (GED) Reasoning Level of 3, and that the laundry folder and office cleaner jobs had a GED Reasoning Level of 2. The premise for Claimant's argument is that GED Reasoning Level 2 describes the need to carry out "detailed but uninvolved" instructions, and GED Reasoning Level 3 places no restriction on the complication of the tasks or instructions to be completed, which conflicted with her limitation, as assessed by the ALJ, to performing simple and routine tasks. Pl.'s Br. at 6. Claimant asserts the ALJ's failure to properly analyze the testimony of Dr. Horton from the February 5, 2019, interview and mental examination, and Dr. Kelly's interpretation of Dr. Horton's adjustment pace, and social limitations resulted in the improper RFC.  The Court agrees.

The ALJ found Dr. Horton's opinion "persuasive" acknowledging that Dr. Horton assessed Claimant as capable of understanding, remembering, managing "most" simple and complex tasks, but that she would be easily overwhelmed and that this would interfere with management of tasks as they became increasingly complex. (Tr. 618). The ALJ further found persuasive Dr. Horton's opinion that Claimant's pace was somewhat below average; that her social skills interfere with her level of adjustment; and that she might not do well in fast-paced or densely populated areas." *Id.* Dr. Horton found the only exception to Claimant's inability to work in fast-paced or densely populated areas would be Claimant working in areas of comfort, such as comic conventions. (Tr. 618). The ALJ found that based on these findings, "Claimant is limited to unskilled work (to address pace problems and the possibility that increased complexity would be overwhelming) [.]" (Tr. 30). However, the ALJ fails to explain why Claimant's mental limitations, including her

adjustment issues, issues with tasks of increased complexity, and issues with densely populated workplaces are addressed by this accommodation.

The record reveals Claimant is already limited to unskilled work given her history of past work and education. Claimant has only a remote and brief work history as a daycare worker that the ALJ characterized as having no past relevant work and thus no relevant skills. (Tr. 30, 415). Further, Claimant's education is remote, with a GED completed in 2004 with no further specialized training. (Tr. 449). A limitation of unskilled work fails to address mental functions because it only addresses issues for skill transfer. *Chapo v. Astrue,* 682 F.3d 1285, 1291 n. 3 (10th Cir. 2012) (*citing Craft v. Astrue,* 539 F.3d 668, 677-678 (7th Cir. 2008) (*holding* "a limitation to unskilled work did not account for several effects of mental impairment")). Here, by virtue of Claimant's vocational and educational history alone, she is already so limited. *See SSR* 82-41(*stating* skills refer to proficiency with work activity in particular tasks or jobs. "It is the acquired capacity to perform the work activities with facility (rather than the traits themselves) giving rise to potentially transferable skills"). This definition explains why SVP 2 jobs are jobs that have activities complicated enough that they require up to 30 days to learn. Nonetheless, despite finding Dr. Horton's finding of adjustment limitations persuasive and consistent with Claimant's treatment records, the ALJ did not explain why "restricting" Claimant to unskilled work accommodated the mental limitations he found persuasive. These limitations include adjustment limitations, pace issues, agoraphobia in densely populated work areas, and becoming overwhelmed with increasingly complex tasks. (Tr. 29-30).

Specifically, the ALJ assigned mail clerk, a job requiring Claimant to be capable of reasoning level three. Reasoning level three requires an individual to deal with problems involving several concrete variables. DOT, 4th Ed., Revised, *Appendix C*, 1011 (1991). The ALJ fails to

explain how his MRFC accommodates Claimant becoming overwhelmed by increasingly complex tasks that he found persuasive. Likewise, the ALJ assigned office cleaner. Despite citing to Claimant's panic attacks and acknowledging the limitations found within Dr. Horton's opinion, this job requires an individual to "render personal assistance to patrons." DOT #323.687-014. Dr. Horton noted Claimant suffered from frequent meltdowns, was socially awkward and a hesitant speaker given her fearfulness. (Tr. 615-616). She spoke of the voices in her head and suffered from dissociative reactions. *Id.* Her awkward social skills were to the point that they would interfere with adjustment in the workplace. (Tr. 618). Nonetheless, the ALJ found work with some public interaction appropriate and failed to explain how the RFC accommodated Claimant's decreased ability to adjust to workplaces given her poor social skills. The ALJ also assigned laundry folder, but did not limit the number of jobs by whether the environment is densely populated even though he found this limitation persuasive. It is unknown to what extent these numbers would be affected by this limitation or how many exist in large establishments with many employees, including large hotels.

      Finally, the ALJ never determined to what extent Claimant's panic and sense of being overwhelmed affected her pace and ability to engage with reasoning three or reasoning two employment. Dr. Horton stated Claimant suffered from poor coping skills that affected management of tasks causing her pace to be below average, interfering with productivity and her ability to manage both simple and complex tasks. (Tr. 618). The ALJ attempted to accommodate these mental limitations with unskilled work. However, the unskilled work limitation fails to accommodate the array of mental health limitations the ALJ himself found persuasive. *Chapo,* 682 F.3d at 1291 n. 3. Consequently, the hypothetical question did not capture all of Claimant's known limitations and a reviewing court cannot know whether Claimant can perform the assigned

employment. *Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995); *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996).

The decision of the Commissioner is accordingly reversed, and the case remanded to the ALJ, *inter alia*, to resolve the conflict between the VE's testimony and Claimant's RFC. The ALJ should include all Claimant's limitations in any hypothetical questions posed to a VE at step five. The ALJ should then redetermine what work, if any, Claimant can perform and ultimately whether she is disabled.

## Conclusion

The Court finds that correct legal standards were not applied by the ALJ, and the decision of the Commissioner is therefore not supported by substantial evidence. Accordingly, the decision of the Commissioner is hereby REVERSED, and the case REMANDED for further proceedings consistent herewith.

**IT IS SO ORDERD this 20th day of March, 2024.**

_____
**STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE**